## STATE OF CONNECTICUT *v.* JAMES DAVIS
### (AC 18619)

Lavery, C. J., and Mihalakos and Zarella, Js.

Argued November 1, 2000—officially released February 6, 2001

*Michelle M. Napoli,* for the appellant (defendant).

*Susann E. Gill,* senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, and *Stephen J. Sedensky,* senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, James Davis, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation

of General Statutes § 53a-70 (a) (1),[1] sexual assault in
the second degree in violation of General Statutes § 53a-
71 (a) (1),[2] risk of injury to a child in violation of General
Statutes § 53-21 (2)[3] and unlawful restraint in the second
degree in violation of General Statutes § 53a-96.[4] On
appeal, the defendant claims that the court improperly
(1) denied his motion to suppress an out-of-court identi-
fication, (2) denied his motion for judgment of acquittal
and (3) instructed the jury as to the element of force
in its charge on the offense of sexual assault in the first
degree. We affirm the judgment of the trial court.

The jury reasonably could have found the following
facts. On the afternoon of April 29, 1997, the victim, a

[1] General Statutes § 53a-70 (a) provides in relevant part: "A person is
guilty of sexual assault in the first degree when such person (1) compels
another person to engage in sexual intercourse by the use of force against
such other person . . . or by the threat of use of force against such other
person . . . which reasonably causes such person to fear physical injury
to such person . . . ."

[2] General Statutes § 53a-71 (a) provides in relevant part: "A person is
guilty of sexual assault in the second degree when such person engages in
sexual intercourse with another person and: (1) Such other person is thirteen
years of age or older but under sixteen years of age and the actor is more
than two years older than such person . . . ."

[3] General Statutes § 53-21 provides in relevant part: "Any person who . . .
(2) has contact with the intimate parts, as defined in section 53a-65, of a
child under the age of sixteen years or subjects a child under sixteen years
of age to contact with the intimate parts of such person, in a sexual and
indecent manner likely to impair the health or morals of such child . . .
shall be guilty of a class C felony."

General Statutes § 53a-65 (8) defines intimate parts as "the genital area,
groin, anus, inner thighs, buttocks or breasts."

[4] In the amended information filed February 23, 1998, the state charged
the defendant with, inter alia, kidnapping in the first degree in violation of
General Statutes § 53a-92 (a) (2) (A). After a jury trial, the defendant was
found not guilty of kidnapping in the first degree and not guilty of the lesser
included offense of kidnapping in the second degree in violation of General
Statutes § 53a-94, but was found guilty of the lesser included offense of
unlawful restraint in the second degree in violation of § 53a-96.

General Statutes § 53a-96 provides: "(a) A person is guilty of unlawful
restraint in the second degree when he restrains another person.

"(b) Unlawful restraint in the second degree is a class A misdemeanor."

fourteen year old girl, walked with her friend M[5] from the victim's home to the apartment where M lived. As the two walked, they came upon two men, one of whom was identified later as the defendant. The men were standing at the end of the driveway leading into the apartment complex. The defendant, age twenty-two, briefly spoke with the two girls as they passed. The defendant further engaged the victim in a brief conversation as she again passed the two men on her return home.

Shortly thereafter, the victim passed the defendant and his companion for a third time as she walked from her home and through the complex to a nearby store. As the victim walked by the two men, the defendant asked who was in her house, to which the victim responded her grandmother, grandfather, mother and cousins. The victim passed the defendant and his companion for a fourth time on her return trip from the store. Soon after arriving home, the victim's grandmother asked her to return to the store. Although the victim did not see either of the two men as she again walked to the store, she saw both of them in the driveway when she returned. The defendant was wearing a yellow and black jacket in addition to the white T-shirt and black pants that the victim saw him wearing earlier. As the victim passed the defendant and his companion for the fifth time, the defendant told her to "go put your stuff in the house and come here." The victim continued walking toward her home. Once there, the victim repeatedly looked out the window to determine whether the defendant remained in the driveway.

After noticing that neither the defendant nor his companion was in the driveway, the victim left her home and walked to the store for a third time. As the victim

---

[5] Both the victim and her friend are minors, and, therefore, to protect their identities, we do not use their names in this opinion.

walked through the complex on her way to the store, she noticed the defendant standing alone on the steps to building number five. The defendant called to the victim, "Come here, I wanna show you somethin'." The victim walked up the stairs nearer to the defendant. As the victim came closer, the defendant grabbed her arm and led her into the basement of the building. The defendant then led the victim down a hallway and up a stairwell, where he began to grope her between the legs and threatened, "If you tell, I'm gonna kill you." The victim partially removed her pants under threat and laid down as the defendant instructed. The defendant got on top of the victim and, as the victim attempted to slide away from the defendant, he inserted his penis into her vagina. Within minutes of the assault, the defendant heard someone in the stairwell and ran from the basement.

The victim immediately dressed and went home. Soon after arriving home, the distraught victim informed her grandmother and M, who had returned to the victim's home, of the assault. The police were called and the victim was transported to the hospital. Meanwhile, M and the victim's uncle accompanied the police in a search for the defendant. The defendant and his companion were located in a park that is within walking distance of the apartment complex. M identified the men as the two individuals that she and the victim had seen earlier in the day. The police placed both the defendant and his companion into a waiting police cruiser. M returned home while the officers proceeded to the hospital with the two men.

Officer Faith Tyghter of the Bridgeport police department interviewed the victim at the hospital. The victim described her assailant "as a black male, slender build, [having] corn rows hairstyle, approximately six feet" and stated that "[h]e was wearing a yellow and black jacket, white T-shirt and a black pair of pants." Tyghter

went outside to the police cruiser, recognized the suspect who fit the description and brought him to the victim's hospital room for identification. After the suspect was removed from the room, the victim identified the individual, the defendant in this case, as her assailant. The victim also identified the defendant in a photographic array on May 15, 1997, and again in court.

The defendant was charged with sexual assault in the first and second degrees, risk of injury to a child and kidnapping in the first degree. He was convicted of each of the sexual assault offenses and of risk of injury to a child. Although the defendant was found not guilty of kidnapping in the first degree and of the lesser included offense of kidnapping in the second degree, he was found guilty of the lesser included offense of unlawful restraint in the second degree. The defendant received a total effective sentence of twenty years imprisonment, execution suspended after fifteen years, and ten years probation. This appeal followed.

I

The defendant first claims that the court improperly denied his motion to suppress the identification at the hospital because it violated his right to due process under the fifth[6] and fourteenth[7] amendments to the United States constitution and article first, §§ 8[8] and 9,[9] of the constitution of Connecticut.

[6] The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ."

[7] The fourteenth amendment to the United States constitution provides in relevant part: "No state shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."

[8] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

[9] Article first, § 9, of the constitution of Connecticut provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

The following additional facts and procedural history are necessary for our resolution of this claim. On or about June 5, 1997, the defendant filed a motion to suppress the out-of-court identification and his statement to the police.[10] A pretrial hearing on the motion was held on March 2, 1998, at which time the state called the victim as a witness. She testified that on the afternoon of April 29, 1997, she passed the defendant and another male at the end of the driveway leading into the complex several times during the afternoon preceding the assault. Each time she passed the defendant and his companion, the defendant engaged her in a brief conversation. She further testified that the defendant was wearing a yellow and black jacket over a white T-shirt and black pants.

The victim testified that shortly after returning from her second trip to the store, she decided to walk to the nearby store for a third time. Although the victim did not see either of the two men as she walked up the driveway to the complex en route to the store, she came upon the defendant as she walked past building number five. The defendant, who was still wearing the yellow and black jacket with the white T-shirt and black pants, was standing at the top of the stairs to the building. He called out to her, "Come here, I want to show you somethin'." He motioned her toward the basement of the building and led her into the basement and up a staircase where the sexual assault took place.

The victim further testified that while at the hospital, she gave a description of the defendant to Tyghter. The victim recounted that Tyghter "kept going out the door, [saying] 'we got him, we got him. . . . We had two boys. You got to tell which one, who it is.' And so she

---

[10] We note, in passing, that although the court denied the defendant's motion to suppress his statement, the statement was not admitted into evidence, and the defendant therefore does not appeal from that part of the court's judgment.

[brought] the boy that I recognized, the one that took me down to the basement." She further testified that she identified the defendant and that he was still wearing the yellow and black jacket, white T-shirt and black pants that he was wearing earlier.

The state then called to the witness stand Tyghter, the officer who interviewed the victim at the hospital. According to her testimony, the victim identified her assailant as a slender black male with a brown complexion, light facial hair and a corn row hairstyle, wearing a yellow and black jacket, white T-shirt and black pants. Tyghter further testified that she relayed this information to another officer, who located the defendant and another male and transported them to the hospital for a positive identification. After they arrived at the hospital, Tyghter went to the police cruiser, selected the suspect who more closely matched the given description and brought him into the hospital. After the victim consented to a face-to-face identification, Tyghter presented the defendant to the victim. After the defendant was removed from the room, the victim identified him as the person who assaulted her.

On cross-examination, Tyghter testified that she selected the defendant over the other individual in the police cruiser based on the victim's description of the suspect's clothing, facial hair and hairstyle, and because the other individual was clean shaven. She further testified that she did not present the other individual to the victim "[b]ecause it was a true identity."

The court, thereafter, denied the defendant's motion to suppress the identification. The court reasoned that the identification was valid because "under the totality of the circumstances . . . [the victim] had a sufficient opportunity to observe the accused on a number of occasions, had seen him before, and [because] there

was a nonsuggestive bringing of the accused forward . . . ."

The defendant claims that the identification at the hospital was unnecessarily suggestive and unreliable, and, therefore, it tainted the subsequent photographic and in-court identifications. We disagree.

"Upon review of a trial court's denial of a motion to suppress, [t]he court's conclusions will not be disturbed unless they are legally and logically inconsistent with the facts. *State* v. *Cofield*, 220 Conn. 38, 44, 595 A.2d 1349 (1991). . . . *State* v. *MacNeil*, 28 Conn. App. 508, 512–13, 613 A.2d 296, cert. denied, 224 Conn. 901, 615 A.2d 1044 (1992). The trial court's factual findings will be reversed only if they are clearly erroneous. . . . *State* v. *Owens*, 38 Conn. App. 801, 804, 663 A.2d 1094, cert. denied, 235 Conn. 912, 665 A.2d 609 (1995)." (Internal quotation marks omitted.) *State* v. *Mills*, 57 Conn. App. 356, 360, 748 A.2d 891 (2000).

"It is well settled that [i]n determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive, and second, if it is found to be so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . The burden rests on the defendant who moves to suppress identification evidence to establish that the identification resulted from the employment of an unconstitutional procedure by the police." (Internal quotation marks omitted.) *State* v. *Gordon*, 56 Conn. App. 512, 513–14, 744 A.2d 453 (2000).

We first address whether the procedure used to identify the defendant at the hospital was unnecessarily suggestive. Our Supreme Court has repeatedly stated that "a one-to-one confrontation between a [victim] and

the suspect presented to him for identification is inherently and significantly suggestive because it conveys the message to the [victim] that the police believe the suspect is guilty." (Internal quotation marks omitted.) *State* v. *Austin*, 244 Conn. 226, 247, 710 A.2d 732 (1998); see *State* v. *Wooten*, 227 Conn. 677, 686, 631 A.2d 271 (1993); *State* v. *Tatum*, 219 Conn. 721, 727, 595 A.2d 322 (1991); *State* v. *Mills*, supra, 57 Conn. App. 361; *State* v. *Sparks*, 39 Conn. App. 502, 509, 664 A.2d 1185 (1995). "Show-ups, however, and procedures like them tend under some circumstances to ensure accurate identifications and the benefit of promptness not only aids reliability but permits a quick release of an innocent party if there is no positive identification, allowing the police to resume the investigation with only a minimum of delay." (Internal quotation marks omitted.) *State* v. *Mills*, supra, 361 (one-on-one show-up in which police stood on either side of defendant not so unduly suggestive as to be improper); see *State* v. *Gagnon*, 18 Conn. App. 694, 703, 561 A.2d 129 (bringing victim to public place by police to identify defendant among patrons entering and exiting restaurant not impermissibly suggestive), cert. denied, 213 Conn. 805, 567 A.2d 835 (1989); see also *State* v. *Askew*, 55 Conn. App. 34, 40 & n.5, 739 A.2d 274 (show-up in which defendant handcuffed, seated in police vehicle and wearing stolen coat, although unduly suggestive, not unreliable), cert. denied, 251 Conn. 918, 740 A.2d 866 (1999); *State* v. *Barnes*, 16 Conn. App. 333, 344, 547 A.2d 584 (1988) (officer's comment to victim during show-up that he had perpetrators in custody, although inappropriate, did not make identification unreliable).

In the present case, the victim testified that Tyghter went to and from the examining room saying, "We got him, we got him. . . . We had two boys. You got to tell which one, who it is." We consider these comments in determining whether the one-on-one show-up was

unduly suggestive. *State* v. *Austin,* 195 Conn. 496, 500, 488 A.2d 1250 (1985). We cannot think of any useful purpose that Tyghter's comments served in the identification process. If they were indeed suggestive, therefore, it follows that they were unnecessarily so. See id., 499.

To the extent that Tyghter's remarks were suggestive, the critical inquiry relates to their impact on the overall reliability of the identification made by the victim. Id., 500. We conclude, on the basis of an analysis of the totality of the circumstances, that the identification was reliable.

"The reliability of an identification procedure is considered under various factors, such as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [his] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977) . . . ." (Internal quotation marks omitted.) *State* v. *Mills,* supra, 57 Conn. App. 362, quoting *State* v. *Davis,* 198 Conn. 680, 683–84, 504 A.2d 1372 (1986).

As discussed earlier, the span of time between the victim's first observation of the defendant, the assault and the victim's identification of the defendant at the hospital was no more than several hours. See *State* v. *Howard,* 221 Conn. 447, 452–55, 604 A.2d 1294 (1992) (identification occurring two and one-half months after commission of crime not unreliable); *State* v. *Gettes,* 42 Conn. App. 472, 478, 680 A.2d 996 (identification occurring fifteen days after commission of crimes did not render identification unreliable), cert. denied, 239 Conn. 921, 682 A.2d 1009 (1996); *State* v. *Felder,* 39

Conn. App. 840, 848, 668 A.2d 382 (1995) (identification made ten days after commission of crime not unreliable), cert. denied, 236 Conn. 906, 670 A.2d 1306 (1996). The victim observed the defendant up close at least five times during the afternoon immediately preceding the assault. Within a short time after the assault, she gave a detailed description of the defendant and what he was wearing to the police. When Tyghter brought the defendant into the victim's hospital room for identification, the victim readily identified the defendant as her assailant. See *State* v. *Mills*, supra, 57 Conn. App. 362–63 (where victim had opportunity to view defendant, provided detailed description and readily identified defendant within short time of attempted robbery, one-on-one identification did not violate defendant's right to due process under United States constitution). Accordingly, we conclude that the show-up did not violate the defendant's right to due process under the constitutions of Connecticut or the United States. The trial court properly denied the defendant's motion to suppress.[11]

## II

The defendant next claims that the court improperly denied his motion to set aside the verdict because the state failed to prove beyond a reasonable doubt the element of sexual intercourse pursuant to §§ 53a-70 (a) and 53a-71 (a), and the element of force or threat thereof pursuant to § 53a-70 (a).[12] This claim is without merit.

[11] In light of our determination that the identification was reliable, we need not consider the defendant's additional claim that the identification at the hospital tainted the victim's subsequent photographic identification and the later in-court identification of the defendant.

[12] The defendant also claims that the court improperly denied the motion because the evidence was insufficient to establish the identification of the defendant as the victim's assailant. In light of our conclusion in part I of this opinion, we conclude that the evidence of the identification was sufficient and that the court properly denied the motion on this ground.

"The trial court's refusal to set aside [a] verdict . . . is entitled to great weight and every reasonable presumption should be given in favor of its correctness. In reviewing the action of the trial court in denying [a motion] . . . to set aside [a] verdict, our primary concern is to determine whether the court abused its discretion and we decide only whether, on the evidence presented, the jury could fairly reach the verdict they did. The trial court's decision is significant because the trial judge has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their evidence. Moreover, the trial judge can gauge the tenor of the trial, as we, on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury." (Internal quotation marks omitted.) *Daigle* v. *Metropolitan Property & Casualty Ins. Co.*, 60 Conn. App. 465, 476, 760 A.2d 117, cert. granted on other grounds, 255 Conn. 915, 763 A.2d 1037 (2000).

To the extent that the defendant's claim rests on a sufficiency of the evidence argument, we apply a two part test to determine whether there was sufficient evidence to sustain the jury's verdict. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Turner*, 252 Conn. 714, 747–48, 751 A.2d 372 (2000). In this process of review, the probative force of the evidence is not diminished, in whole or in part, if the evidence "is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Smith*, 57 Conn.

App. 290, 296, 748 A.2d 883, cert. denied, 253 Conn. 916, 754 A.2d 164 (2000).

The defendant argues that the evidence was wholly insufficient to find that he engaged in sexual intercourse with the victim as required for a conviction under §§ 53a-70 (a) and 53a-71 (a). In support of his argument, the defendant notes that there was no medical evidence of tears or abrasions in the victim's vagina or her introitus hymen. Notwithstanding this argument, the jury had before it other evidence from which it could determine whether penetration had occurred.

Section 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person . . . or by the threat of use of force against such other person . . . which reasonably causes such person to fear physical injury to such person . . . ." Section 53a-71 (a) similarly provides in relevant part: "A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and: (1) Such other person is thirteen years of age or older but under sixteen years of age and the actor is more than two years older than such person . . . ." For purposes of these two sections, sexual intercourse is defined in relevant part as "vaginal intercourse . . . between persons regardless of sex. . . . Penetration, however slight, is sufficient to complete vaginal intercourse . . . and does not require emission of semen. . . ." General Statutes § 53a-65. Penetration, therefore, is an element of the offenses of sexual assault in the first and second degrees, which the state was required to prove beyond a reasonable doubt. *State* v. *Artis*, 198 Conn. 617, 621, 503 A.2d 1181 (1986).

The jury reasonably could have concluded that the defendant had vaginally penetrated the victim. See id.

("[w]hether there was actual penetration was a question of fact for the jury"). The victim testified that the defendant got on top of her and inserted his penis into her vagina. See id. (" '[w]hen one of understanding testifies to a completed act of sexual intercourse, it has been held to be sufficient proof of penetration' "); *State v. Orhan*, 52 Conn. App. 231, 236, 726 A.2d 629 (1999) (victim's testimony that defendant inserted his finger into her vagina constituted sufficient evidence of element of penetration pursuant to § 53a-70 [a]). George Reese, a physician employed by Saint Vincent's Medical Center who examined the victim shortly after the assault, testified that although there was no indication of vaginal tears or abrasions, "with an assault of a person who is a teenager or older, the architecture of the vaginal area is such that you wouldn't necessarily see any overt or outward sign of trauma with penetration with a penis."[13] Reese diagnosed the victim as having moderate tenderness in the vaginal area, of which she complained, and that such tenderness was the result of trauma. Reese further testified that "there was some dried discharge on the thighs and pubic hair." Accordingly, we conclude that the jury reasonably could have determined that penetration occurred on the basis of these facts and the inferences reasonably drawn therefrom.

The defendant also argues that the evidence was insufficient to find that he compelled the victim to engage in sexual intercourse through the use of force[14] or threat thereof pursuant to § 53a-70 (a). The victim testified that the defendant grabbed her by the arm and led her into the basement of building number five, and

---

[13] On cross-examination, Reese testified that the victim's hymen would not have necessarily ruptured with two or three minutes of penile vaginal intercourse.

[14] General Statutes § 53a-65 (7) defines the use of force as: "(A) Use of a dangerous instrument; or (B) use of actual physical force or violence or superior physical strength against the victim."

that the defendant threatened, "If you tell, I'm gonna kill you." The victim further testified that the defendant threatened that if she did not remove her clothes, he would kill her. She also testified that the defendant opened her pants and started grabbing between her legs. On the basis of this evidence, the jury reasonably could have concluded that the defendant threatened to use force and actually used force against the victim.[15] See *State* v. *Kish*, 186 Conn. 757, 766–67, 443 A.2d 1274 (1982) (evidence that defendant grabbed victim's wrist, forced her into bedroom and threatened victim is sufficient to prove element of force); *State* v. *Coleman*, 52 Conn. App. 466, 470, 727 A.2d 246 (victim's testimony that defendant "held her right shoulder and pushed his body weight against her" sufficient evidence of use of force), cert. denied, 249 Conn. 902, 732 A.2d 776 (1999); *State* v. *Jackson*, 30 Conn. App. 281, 287–88, 620 A.2d 168 (defendant's placing of hand over victim's mouth and pushing victim against wall and down sufficient evidence of forcible sexual assault), cert. denied, 225 Conn. 916, 623 A.2d 1026 (1993). Accordingly, the court properly denied the defendant's motion to set aside the verdict.

---

[15] We are compelled to respond to the defendant's argument that because the victim did not "tell her alleged assailant to stop," nor did she scream or "exhibit any indication of protest . . . there is no credible evidence that the victim was assaulted through the use of force." In *State* v. *Coleman*, 52 Conn. App. 466, 469–70, 727 A.2d 246, cert. denied, 249 Conn. 902, 732 A.2d 776 (1999), we reaffirmed that § 53a-70 "no longer requires that the state prove that *physical force overcame earnest resistance.* . . . [T]he state is now required to prove that it was the use of force or its threat which caused the victim to engage in sexual intercourse, and does not by its express language require that resistance be proven. See also *State* v. *Kulmac*, 230 Conn. 43, 75, 644 A.2d 887 (1994) (focus in sexual assault case is not conduct of victim and adequacy of resistance, but conduct of defendant and use of force or threat of use of force)." (Internal quotation marks omitted.) We take this opportunity to reiterate once again that the focus in a sexual assault case is the defendant's use of force or threats thereof in compelling the victim to engage in sexual intercourse, not the victim's reaction to such force or threats.

## III

The defendant's final claim is that the court misled the jury when it instructed on the element of force during the charge on sexual assault in the first degree because there was no evidence presented that the defendant used force against the victim. The defendant failed to object to the instruction at trial and now seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). He argues that he is entitled to *Golding* review because the court's instruction could have led the jury to believe that "the act of touching constituted force," and, therefore, the instruction violated his right to due process under the fourteenth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut.

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id.; see also *State* v. *Montgomery*, 254 Conn. 694, 711 n.26, 759 A.2d 995 (2000). "We may . . . dispose of the claim by focusing on the condition that appears most relevant under the circumstances of the case." (Internal quotation marks omitted.) *State* v. *Burrus*, 60 Conn. App. 369, 375, 759 A.2d 149 (2000).

Although the record is adequate to review the defendant's claim, the defendant fails to satisfy the third prong of *Golding* because a constitutional violation did not clearly exist. Moreover, in light of our conclusion

in part II of this opinion that there was sufficient evidence for the jury to conclude that the defendant used force or the threat thereof during the sexual assault of the victim, the defendant's claim must fail to the extent that it rests on the argument of insufficiency of evidence as to force or the threat thereof.

To the extent that the defendant's claim challenges the propriety of the instruction as to the element of force, we conclude that the instruction was proper. The instruction in no way could have led the jury to believe that the act of touching was sufficient to satisfy the element of force. See *State* v. *Floyd*, 253 Conn. 700, 714, 756 A.2d 799 (2000) (court considers jury charge as a whole to determine whether it was reasonably possible for jury to be misled).

The court began its instruction on the charge of sexual assault in the first degree by reading the relevant portion of § 53a-70 almost verbatim. The court further instructed the jury in relevant part: "For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt. That the defendant compelled another person to engage in sexual intercourse. That the sexual intercourse was accomplished by the use of force against the victim or by the threat of use of force against the victim which reasonably caused the victim to fear physical injury to herself. . . . Compelled has its ordinary meaning. It means that the victim did not consent and that the defendant must have required the victim to engage in sexual intercourse against her will. In this case, the state has charged that the sexual intercourse was compelled by the use of force and by the threat of the use of force. These are two methods by which compulsion may be demonstrated and proven. That element will be established as long as each of you find proven beyond a reasonable doubt that the intercourse was compelled, either by the use of force or the threat of the use of

force. Simply put, it is not necessary for the state to prove that the intercourse was compelled both by the use of force and by the threat of the use of force, as long as each one of you is satisfied that it was compelled by force or the threat of the use of force. Use of force means use of actual physical force or violence or superior physical strength against the victim.

"You may find a threat of use of force because you find that a threat was actually expressed. Or you may find a threat implied from the circumstances and from what you find to have been the defendant's conduct. Any such threat must have been such as it reasonably caused the victim to fear physical injury to herself."

The court then discussed briefly and in general terms some of the evidence that was presented. During this discussion, the court noted that "the only reason I'm not describing [the assault] to you is because you heard the evidence and you're the ones that find the facts, not myself."

The defendant's claim that the court's instruction as to the element of force was misleading is wholly without merit. The defendant was not deprived of his right to due process, and, therefore, the claim does not satisfy the third prong of *Golding*. The defendant cannot prevail on this claim.

The judgment is affirmed.

In this opinion the other judges concurred.