STATE OF CONNECTICUT *v.* DAMON MAHON
(AC 25897)

Bishop, Rogers and Peters, Js.

Argued May 23—officially released September 12, 2006

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Joan K. Willin*, special deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Herbert E. Carlson, Jr.*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Damon Mahon, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), sexual assault in the first degree as an accessory in violation of General Statutes §§ 53a-70 (a) (1) and 53a-8, conspiracy to commit sexual assault in the first degree in violation of General Statutes §§ 53a-70 (a) (1) and 53a-48 (a), sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), risk of injury to a child in violation of General Statutes §§ 53-21 (a) (1) and (2) and 53a-8, kidnapping in the second degree in violation of General Statutes § 53a-94 (a), and conspiracy to commit kidnapping in the second degree in violation of General Statutes §§ 53a-94 (a) and 53a-48 (a). On appeal, the defendant claims that (1) the evidence was insufficient to sustain his conviction of (a) sexual assault in the first degree, (b) sexual assault in the first degree as an accessory, (c) conspiracy to commit sexual assault in the first degree, and (d) kidnapping in the second degree and conspiracy to commit kidnapping in the second degree, and (2) the court's failure to instruct the jury properly on the accessorial liability charge misled the jurors and deprived him of his right to a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 1, 2002, A, who was thirteen years

old at the time,[1] was walking home after escorting her boyfriend to a bus stop. As she was walking, the defendant and Oraine Duncan drove up beside her in a two door Honda Civic hatchback. The defendant, who was seventeen years old at the time, was driving the car, and Duncan was in the passenger seat. Duncan, who was eighteen years old at the time, was an acquaintance of A, having dated A's cousin, M, and the two had talked on the telephone and corresponded through e-mail.

The defendant and Duncan offered A a ride home and she accepted. Once in the car, the defendant and Duncan asked A if she would like to go with them to M's house. A agreed to accompany the two men, but when they arrived at M's house, she stated that she did not want to go inside because she was supposed to be on her way home and would be in trouble if M's mother saw her there. Duncan then went inside to visit M, leaving A and the defendant in the car.

While they were in the car, the defendant asked A a series of sexually suggestive questions, such as whether she had begun menstruating, if she could get pregnant, if she had sex before, if she had sex with her boyfriend and if she ever had oral sex with her boyfriend. A testified that the questions made her nervous, and she responded by stating only that she was a virgin. Shortly thereafter, Duncan returned to the car with M. Although A motioned for M to come with them, the defendant ended up driving off without M.

Instead of driving A home, the defendant then drove to and parked the car in a field off a dirt road. When the car came to a stop, the defendant was in the driver's seat, Duncan was in the passenger's seat and A was in

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e. We therefore refer to the victim of the sexual assault as A.

the seat behind Duncan. Duncan then exited the car. A recalled that when the door opened she noticed that the "grass was real high." Duncan pushed the passenger seat forward toward the glove compartment and positioned himself in front of A, who was seated, but slouched down in the backseat. The defendant then exited the car, walked around to the passenger's side and opened the passenger door to "see what was going on."

A recalled that the defendant and Duncan stated that they wanted to "[g]et there and let off,"[2] to which she replied that she "didn't want to do this because she was saving [herself] for [her] boyfriend." Duncan then unzipped his pants, reached underneath A's skirt and attempted to pull down her underpants. When Duncan could not get A's underpants down, the defendant reached in from outside the car and pulled A's underpants down past her knees. Duncan then engaged in vaginal sexual intercourse with A while the defendant stood outside the car watching. During the sexual assault, A stated that she was silent because she was in "shock" and "really didn't know what was happening."

After Duncan had sexual intercourse with A, he moved into the driver's seat, and the defendant entered the car from the passenger side door. The defendant then had vaginal sexual intercourse with A. A stated that she was in shock, too scared to say anything and too afraid to fight back because she believed it would be futile. A explained that she "wasn't going to fight two males; I mean, I wouldn't have won in that case, so I just didn't fight back." A recalled that while she used her hand to hold the defendant back or restrain

---

[2] A testified that at the time, she did not know what it meant to "get there and let off." Given A's response to the statement and the events that took place after the statement was made, however, we believe that it would have been reasonable for the jury to believe that the remark connoted the defendant's and Duncan's intent to have sexual intercourse with A.

him to protect herself during the sexual assault, she did not push him away. She stated that she began crying during the sexual assault and Duncan told the defendant to stop because he was hurting A. The defendant, however, replied that he was "almost finished" and continued the sexual assault. Additional facts will be set forth where necessary.

## I

The defendant first claims that there was insufficient evidence to convict him of (a) sexual assault in the first degree, (b) sexual assault in the first degree as an accessory, (c) conspiracy to commit sexual assault in the first degree, and (d) kidnapping in the second degree and conspiracy to commit kidnapping in the second degree. We address the first three sufficiency claims concerning the conviction of the sexual assault charges together and the kidnapping claims in turn. We begin by setting forth our standard of review for sufficiency of the evidence claims.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those

inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Holmes*, 94 Conn. App. 494, 505, 892 A.2d 969, cert. denied, 278 Conn. 908, 899 A.2d 35 (2006).

## A

The defendant claims that the court, in denying his motion for a judgment of acquittal, improperly determined that the state had proved the elements of sexual assault in the first degree, sexual assault in the first degree as an accessory[3] and conspiracy to commit sexual assault in the first degree[4] because there was no evidence presented at trial that either he or Duncan had used force or threatened to use force to compel A to engage in sexual intercourse. We do not agree.

We begin our analysis with an examination of § 53a-70 (a) (1) and the relevant case law. Section 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person,

---

[3] "[A]ccessorial liability is not a distinct crime, but only an alternative means by which a substantive crime may be committed . . . . Consequently, to establish a person's culpability as an accessory to a particular offense, the state must prove that the accessory, like the principal, had committed each and every element of the offense." (Internal quotation marks omitted.) *State* v. *Martinez*, 278 Conn. 598, 618, 900 A.2d 485 (2006).

[4] Our Supreme Court in *State* v. *Martinez*, 278 Conn. 598, 900 A.2d 485 (2006), stated that it "adopted the [*Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946)] principle of vicarious liability for purposes of our state criminal law in *State* v. *Walton*, [227 Conn. 32, 45–46, 630 A.2d 990 (1993)]. Under the *Pinkerton* doctrine . . . a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy." (Internal quotation marks omitted.) *State* v. *Martinez*, supra, 611.

or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ." Thus, to prevail on its charges of sexual assault in the first degree, sexual assault in the first degree as an accessory and conspiracy to commit sexual assault in the first degree, the state was required to prove that the defendant used force or the threat of force to compel A to engage in sexual intercourse. See *State* v. *Kulmac*, 230 Conn. 43, 76, 644 A.2d 887 (1994).

Although force is defined in General Statutes § 53a-65 (7) as "[u]se of a dangerous instrument; or . . . actual physical force or violence or superior physical strength against the victim," § 53a-70 "no longer requires that the state prove that physical force overcame earnest resistance . . . . [T]he state is now required to prove that it was the use of force or its threat which caused the victim to engage in sexual intercourse, and does not by its express language require that resistance be proven." (Internal quotation marks omitted.) *State* v. *Davis*, 61 Conn. App. 621, 636 n.15, 767 A.2d 137, cert. denied, 255 Conn. 951, 770 A.2d 31 (2001). Thus, while it is a fundamental principle in our jurisprudence that "proof of physical violence is sufficient to establish that the sexual assault was compelled by the use of force or a threat of the use of force, nothing . . . in our law, suggests that proof of physical violence is necessary to establish that the sexual intercourse or contact has been compelled by the use of force or a threat of the use of force." *State* v. *Jackson*, 30 Conn. App. 281, 288, 620 A.2d 168, cert. denied, 225 Conn. 916, 623 A.2d 1026 (1993).

The defendant argues that no evidence was introduced to prove that the defendant threatened A or that the defendant or Duncan were of a superior strength or size than A. While the record reveals that A was taller than the defendant, it is undisputed that A was

petite and that both men were present and surrounding her at the time of the incident. The defendant maintains, however, that the only alleged act of force undertaken against A, which reasonably could be considered evidence of force, was the pulling down of her underpants, but that pursuant to *State* v. *Hufford*, 205 Conn. 386, 391–95, 533 A.2d 866 (1987), the act of removing a victim's clothing to engage in a sexual assault is insufficient evidence of force. The defendant's argument mischaracterizes our Supreme Court's holding in *Hufford*.

Contrary to the defendant's assertion, *Hufford* did not create a per se rule that the act of removing a victim's clothing to engage in sexual intercourse always is insufficient evidence of force. Rather, *Hufford* simply stands for the proposition that if a complainant is already under medical restraint, the act of unzipping her pants and opening her blouse requires no force.[5] *State* v. *Hufford*, supra, 205 Conn. 386, 393; see *State* v. *Gagnon*, 18 Conn. App. 694, 697–98, 561 A.2d 129, cert. denied, 213 Conn. 805, 567 A.2d 835 (1989). Here, unlike *Hufford*, A was not under any medical restraint, and the jury reasonably could have concluded that the

---

[5] In *Hufford*, the complainant alleged that she was sexually assaulted by an ambulance technician while en route to the hospital. She claimed that after the defendant and another technician had restrained her on a stretcher so that she was unable to move her limbs, she was placed in the rear of the ambulance alone with the defendant. She further alleged that the defendant unbuttoned her blouse and unzipped her pants and sexually assaulted her. The defendant was charged with and convicted of sexual assault in the third degree pursuant to General Statutes § 53a-72a (a) (1) (A). The Supreme Court reversed the defendant's conviction, concluding that the defendant did not exert the type of force contemplated by § 53a-72a (a) (1) (A). *State* v. *Hufford*, supra, 205 Conn. 395.

"The court explained that to prove the use of force element the evidence must demonstrate either violence or some other form of physical coercion. . . . In order to effectuate the sexual assault in *Hufford*, [n]either violence, nor physical coercion, nor use of superior strength was necessary because [t]he complainant had been legally rendered immobile for transport to the hospital . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Gagnon*, 18 Conn. App. 694, 698, 561 A.2d 129, cert. denied, 213 Conn. 805, 567 A.2d 835 (1989).

defendant's act of removing her underpants, to assist his companion in sexually assaulting her, constituted force. Thus, as this claim relates to the defendant's conviction of conspiracy to commit sexual assault in the first degree and sexual assault in the first degree as an accessory, the jury reasonably could have found that his forcible removal of the A's underpants while she was under assault from Duncan met the force requirement of the statute.

So, too, we believe there was sufficient evidence of force for the jury to have concluded that the defendant was guilty, as a principal,[6] of sexual assault in the first degree. Although it is true that typically in cases in which force has been proven, the evidence demonstrated either violence or some other form of physical coercion, we have consistently held that one also may be guilty of sexual assault in the first degree if one uses one's physical size or strength to threaten another to submit to sexual intercourse and that such threat may be expressed or *implied*. See *State* v. *Kulmac*, supra, 230 Conn. 76; see also *State* v. *Chapman*, 229 Conn. 529, 547, 643 A.2d 1213 (1994); *State* v. *Davis*, supra, 61 Conn. App. 639.[7] Indeed, our Supreme Court held in *State* v. *Kulmac*, supra, 76, that a defendant's use of

---

[6] We note that to be found guilty of sexual assault in the first degree in violation of General Statutes § 53a-70 (a), one need not engage in sexual intercourse with the victim. Rather, the statute "extend[s] liability . . . to those who compelled another to engage in sexual intercourse but did not engage in intercourse themselves." *State* v. *Warren*, 14 Conn. App. 688, 694, 544 A.2d 209, cert. denied, 209 Conn. 805, 548 A.2d 442 (1988), cert. denied, 488 U.S. 1030, 109 S. Ct. 839, 102 L. Ed. 2d 971 (1989).

[7] In *State* v. *Davis*, supra, 61 Conn. App. 621, we held that the trial court correctly charged the jury on the elements of sexual assault in the first degree, where the court stated: "You may find a threat of use of force because you find that a threat was actually expressed. Or you may find a threat implied from the circumstances and from what you find to have been the defendant's conduct. Any such threat must have been such as it reasonably caused the victim to fear physical injury to herself." (Internal quotation marks omitted.) Id., 639.

his "superior physical size and strength, or an implied threat thereof, to compel [one of the victims in that case] to engage in intercourse" was sufficient to sustain his conviction of sexual assault in the first degree. In *Kulmac,* our Supreme Court reasoned that the "victim was not required to resist the defendant every time he assaulted her . . . [where the victim] testified that she had been afraid of the defendant and she knew by experience that [the defendant] was too strong for her to succeed." Id. The defendant in that case had sexually assaulted the victim twice. Id., 74. The first time, the victim testified, the defendant used his superior size and strength to compel her to engage in sexual intercourse. Id., 75. The second time, the victim testified, she had neither told the defendant to stop nor resisted because she was afraid. Id.

In this case, as in *Kulmac,* A testified that she was afraid to resist the defendant's and Duncan's sexual advances because she knew that her resistance in the backseat of the two door hatchback would be futile. The jury could have inferred that the defendant's cumulative actions, including his conduct during Duncan's assault of A, constituted an implied threat to use force unless A submitted to his sexual assault.

In sum, the jury reasonably could have found that the defendant and Duncan, who were four to five years older than A, intentionally parked the hatchback car in a field off a dirt road and blocked A's exit from the car to place A in a position in which she would be forced to submit to sexual intercourse. The jury reasonably could have concluded that given the surrounding circumstances, A realized that she could not fight off two older men and felt compelled to submit to sexual intercourse. The jury also reasonably could have inferred that the defendant's act of forcibly removing A's underpants, to assist Duncan in sexually assaulting A, constituted an implied threat that he would use force to

compel her to engage in sexual intercourse with him and that such implied threat was intended to and did in fact compel A to submit to sexual intercourse with the defendant. Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that there was sufficient evidence from which the jury could have concluded that the defendant used an implied threat of force to compel A to submit to sexual intercourse. Accordingly, the defendant's claim that the evidence was insufficient to sustain his conviction of sexual assault in the first degree, sexual assault in the first degree as an accessory and conspiracy to commit sexual assault in the first degree must fail.

## B

The defendant also claims that there was insufficient evidence to convict him of kidnapping in the second degree and conspiracy to commit kidnapping in the second degree because there was no evidence that A was restrained or abducted. The record belies that claim.

"A person is guilty of kidnapping in the second degree when he abducts another person." General Statutes § 53a-94 (a). General Statutes § 53a-91 (2) defines "abduct" as "restrain[ing] a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation."

General Statutes § 53a-91 (1) defines "restrain" as "restrict[ing] a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. . . . [W]ithout consent means, but is not limited to, (A) deception and

(B) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement." (Internal quotation marks omitted.)

The defendant concedes that the consent prong of the kidnapping statute was satisfied by proof that he picked up A, who was less than sixteen years old, and moved her to a location without the consent of her parents. The defendant contends, however, that there was no evidence that A's movement was restricted or that she was confined because there was neither evidence that the field off the dirt road "was so secluded that A would not be found," nor was there evidence that the defendant prevented A from leaving the car.

Even if we assume, without deciding, that the evidence that the defendant drove A to a field off a dirt road was insufficient to show that he secreted her in a place where she was not likely to be found,[8] the evidence introduced at trial amply supported a finding that he used or threatened to use physical force or intimidation to restrain A.

Indeed, an analogous situation was presented to this court in State v. Cotton, 77 Conn. App. 749, 778, 825 A.2d 189, cert. denied, 265 Conn. 911, 831 A.2d 251 (2003). In Cotton, we held that there was sufficient evidence to support a conviction of kidnapping in the first degree where the "defendant intentionally detoured from the route to the victim's house and entered [a] parking lot . . . with the intent to abuse [the victim] sexually." Id. Although the victim in that

---

[8] The defendant argues that there was evidence that the dirt road was off of a main road, there were numerous houses and buildings nearby and that the field was near A's home.

case was visually impaired and dependent on the defendant's assistance to walk home, her visual disability was not the determinative factor, but rather was one of the many factors that convinced us that the jury reasonably could have found that the defendant used intimidation to restrain the victim and force her to remain in the car. Id.

Similarly, in this case, the jury reasonably could have found that the defendant intentionally detoured from taking A home and took her to a field off of a dirt road with the intent to sexually assault her. As we previously stated, the evidence established that the defendant and Duncan were about four to five years A's senior. Although there was no evidence that the defendant or Duncan were larger than A, there was evidence that A was petite and outnumbered. There was also evidence that she was seated in the backseat of a two door hatchback car, with the defendant and Duncan blocking the exits. Viewing the evidence in the light most favorable to sustaining the verdict, the jury reasonably could have concluded that the defendant used the threat of force or intimidation to restrain A. Accordingly, we hold that there was sufficient evidence to sustain the defendant's conviction of kidnapping in the second degree and conspiracy to commit kidnapping in the second degree.

## II

The defendant next claims that the court's failure to instruct the jury properly on the accessorial liability charge misled the jurors and deprived him of his right to a fair trial. Specifically, the defendant alleges that the court (a) improperly charged the jury on dual intent and (b) did not include his requested instruction on mere presence. We disagree.

As the defendant did not preserve either claim for appeal, he requests review pursuant to *State* v. *Golding*,

213 Conn. 233, 239–40, 567 A.2d 823 (1989). Because the record is adequate for review and the defendant's claim is of constitutional magnitude, we will review the claims under *Golding*. See id. The defendant cannot prevail, however, because the alleged constitutional violations did not clearly exist, and he was not clearly deprived of a fair trial. See id.

A

We first address the issue of whether the court improperly instructed the jury on dual intent.[9] Specifically, the defendant claims that the court incorrectly

[9] As to the charge of accessorial liability, the court gave the following instruction: "Now, count two alleges the crime of sexual assault in the first degree as an accessory . . . . As to this count, the state does not claim that the defendant himself directly committed the crime charged. . . . The state claims in count two that the defendant is guilty of count two by virtue of being an accessory to the sexual assault of [the victim] by Oraine Duncan. An accessory is a criminal participant in the crime. If two or more persons participate in a crime, they are equally responsible even though it was the immediate act of only one, which actually brought the crime about. Participation means not only actively sharing in its final commission, but in doing anything to aid or assist the conduct which caused it.

"Our statute that we call our accessory statute states [that] a person acting with the mental state required for the commission of an offense who intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. If a person did what is specified in the statute, he is in the—in the accessory statute, he is [in the] eyes of the law just as guilty of the crime charged as though he directly committed it or directly participated in its commission. Everyone is a party to a crime who actually commits it or who does some act forming part of it or who assists in its actual commission.

"If there is a joint criminal enterprise, each party to it is criminally responsible for all acts done in furtherance of it. The other person is an accessory to the commission of a crime if, acting with the mental state required, that is, the criminal intent required by the statute for the commission of the crime of sexual assault, he intentionally aids another person in the commission of that crime. To aid simply means to help or assist.

"In order to be an accessory to a crime, the defendant must have the same criminal intent required for the crime to which he is an accessory, and I'll talk to you about intent in just another moment."

The court then charged the jury that the defendant, "to be guilty of count two, *must have had the intent to commit the crime of sexual assault in*

instructed the jury that to be liable as an accessory to a crime, he needed to have only the intent to aid the principal instead of charging the jury that to be liable as an accessory to a crime, one must have the dual intent both to aid the principal in committing the crime and to have the underlying crime committed at the time he aided the principal.

"In determining whether a trial court's charge satisfies constitutional requirements . . . individual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge.

---

*the first degree—strike that. That's not correct.* [The defendant] must have had the intent to aid Mr. Duncan as the principal perpetrator of the crime and had the intent to aid the other person in the actual commission of that crime."

The court then continued to explain that "a person acts intentionally with respect to a result or to conduct described by the statute defining an offense when his conscious objective is to cause such result or engage in such conduct. Intentional conduct is purposeful conduct rather than conduct that is accidental or inadvertent.

"Intent is a mental process. Intent can often be proven by the actions and statements of the person whose act is being committed. It's not likely that we can have someone come into court and say, 'I looked into another person's mind and saw there a certain intent.' Intent is often impossible and never necessary to prove by direct evidence. Intent can be proven by circumstantial evidence. And one way in which a jury can determine what a person's intention was at any given time is by determining what that person's conduct was, including any statements the person made and what the circumstances were surrounding that conduct, and from that conduct and those circumstances inferring what the intention was. In other words, a person's intention may be inferred from that person's conduct. You may infer from the fact that the accused engaged in a particular conduct that he intended to engage in that conduct. But that inference is not a necessary one; you're not required to infer intent from the accused's conduct, but it is an inference that you may draw if you find it to be both reasonable and logical. And remember, the burden of proving intent is on the state to prove intent beyond a reasonable doubt, the intent to assist Oraine Duncan in the crime of sexual assault in the first degree.

"Now, at this point in the accessorial charge, what I would do is tell you the elements of the crime of sexual assault in the first degree. Compel sexual intercourse by use of force or by threat of use of force. But I just gave you that in the first count, and you're remarkably attentive, so I'm just going to incorporate the elements from count one into count two." (Emphasis added.)

. . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Internal quotation marks omitted.) *State* v. *LaSalle*, 95 Conn. App. 263, 278, 897 A.2d 101, cert. denied, 279 Conn. 908, 902 A.2d 1227 (2006).

Our review of the jury's charge reveals that the court did misspeak once during its instruction on dual intent by incorrectly stating that the state did not have to prove that the defendant "had the intent to commit the crime of sexual assault in the first degree . . . ." See footnote 9. When the jury charge is read in its entirety, however, it is clear that this slip of the tongue reasonably could not have misled the jury because both before and after the court's imprecise statement, the court correctly instructed the jury as to the dual intent necessary to find the defendant guilty of the crime.[10] We have held that an inadvertent slip of the tongue in summarizing jury instructions does not mean that a defendant was deprived of his right to a fair trial when the record reveals that the court properly instructed the jury on the elements of the crime. See *State* v. *Schiavo*, 93

---

[10] Even if one could argue that the instruction was somewhat ambiguous, it would not constitute reversible error in light of the fact that if the jury, on the basis of the evidence adduced at trial, found that the defendant intentionally aided Duncan in the commission of the sexual assault by removing the victim's underpants, he also logically must have had the intent that Duncan commit the sexual assault.

Conn. App. 290, 298, 888 A.2d 1115, cert. denied, 277 Conn. 923, 895 A.2d 797 (2006).

Additionally, we are mindful of defense counsel's failure to object to the jury charge at trial. "Where counsel . . . seeks to raise on appeal a potential defect in the jury charge which he did not raise at trial, his silence at trial is a powerful signal that, because of the posture of the case, he did not hear the defect in the harmful manner which he presses on appeal, or even if he did so hear it, he did not deem it harmful enough to press in the trial court. When the principal participant in the trial whose function it is to protect the rights of his client does not deem an issue harmful enough to press in the trial court, the appellate claim that the same issue clearly deprived the defendant of a fundamental constitutional right and a fair trial . . . is seriously undercut." (Internal quotation marks omitted.) Id. Although counsel's failure to object does not in and of itself negate his right to *Golding* review, it does add credence to the state's position that the error did not violate the defendant's constitutional rights. Id., 299. Having concluded that the alleged constitutional violation did not exist, his claim must fail under the third prong of *Golding*.

B

The defendant also seeks *Golding* review of his claim that the court failed to instruct the jury that a finding of mere presence, passive acquiescence or innocent acts that aided the principal were insufficient evidence for a finding of accessorial liability.

Our Supreme Court has held that "a mere presence instruction is not necessary when the jury is properly instructed on the elements of the crime and the evidence has established that the defendant's involvement went far beyond mere presence." *State* v. *Lewis*, 67 Conn. App. 643, 649, 789 A.2d 519, cert. denied, 261

Conn. 938, 808 A.2d 1133 (2002), citing *State* v. *Gasparro*, 194 Conn. 96, 111–13, 480 A.2d 509 (1984), cert. denied, 474 U.S. 828, 106 S. Ct. 90, 88 L. Ed. 2d 74 (1985). We conclude that in light of the court's proper instruction to the jury regarding accomplice liability, and mindful of the evidence of the defendant's conduct while Duncan assaulted A, an instruction on mere presence was not warranted. Thus, this claim also fails under the third prong of *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.